Stewart, J.
The Court of Appeals, in reversing the judgment of the Court of Common Pleas, found as prejudicial error the action of the trial court in submitting to the jury in advance of argument two special instructions requested by plaintiff, in failing to include in its general charge to the jury charges requested by defendant on the subject of the liability of defendant, and in submitting to the jury and entering judgment thereon the form of special verdict returned by the jury.
Plaintiff relies on each of these findings as grounds of reversal in this appeal, together with a general assignment that the Court of Appeals committed error in reversing the judgment.
Defendant has filed an assignment of errors herein, contending that the Court of Appeals committed error in failing to render judgment in its favor, and in failing to find that both the evidence in the record and the special verdict returned by the jury were legally insufficient to sustain judgment for plaintiff. These claims of error were raised in the trial court by defendant’s motion for a directed verdict at the end of plaintiff’s evidence, by the renewal thereof at the conclusion of all the evidence, and by defendant’s motion for judgment notwithstanding the verdict. They were raised again in the Court of Appeals by defendant’s first assignment of error, in which it complains of the action of the Court of Common Pleas in failing to ren *87 der judgment in defendant’s favor as a matter of law.
The evidence in this case is extensive and complicated.
Plaintiff offered testimony to the effect that delivery of the 1949 Ford automobile was on July 10, 1948, and that, when the purchase was made, plaintiff and his son observed some work being done on it on the second floor of defendant’s place of business, the automobile having been repaired by painting certain portions thereof prior to delivery.
Plaintiff testified that on his first day of operation of the automobile “it veered off to the left and to the right at different times.”
The car after its first trip was returned to have replaced a lost drainout plug in the oil pan of the motor, at which time plaintiff told the employee on duty that “the car was steering right from left to right.” On July 12, 1948, plaintiff picked up the car, and, in response to a statement by plaintiff that he did not like the way the car steered, the employee of defendant who delivered the ear said that the steering apparatus had been checked and that it was “O. K.”
Plaintiff testified that on five or six occasions he had taken the car into the service department of defendant- and complained that the steering was not right.
In evidence are work orders dated July 23, 1948, with a notation, ‘ ‘ Check front end — pulls to right when driving,” and September 1, 1948, containing a notation, “Car pulls to right. Correct.” In evidence is a “steering alignment inspection report,” dated September 1,1948, which details the “toe-in,” “camber,” “caster,” and turning radius of the front end of the Ford automobile and shows the kingpins on right and left as “O. K.”
Work orders of defendant disclose that on September 27, 1948, the car was in the shop for repair of *88 the right door, on January 30, 1949, for repair of the rear deck handle, on February 2,1949, for overhauling of the rear axle and timing and adjusting of the motor, on March 8, 1949, for repair of the rear door, motor tuneup and brake adjustment, on March 15, 1949, for replacement of left door molding, and on April 1,1949, for installation of shims on the right door. None of these work orders contains any notation relating to steering or other defects in the front end of the car.
On March 8, 1949, plaintiff complained to the assistant service manager of defendant, at the time the car was left for repairs to the rear door and for motor tuneup and brake adjustment, and when plaintiff returned the next day for the car the assistant manager and plaintiff took the car for a trial run, during a part of which the assistant manager drove and afterward assured plaintiff the car was in good condition.
On April 7, 1949, plaintiff and his wife were driving from Toledo to Marion, Ohio, over U. S. route 23. When they reached a point three miles north of Marion, and plaintiff was driving on a slight curve to the east and down grade, the car left the pavement onto the berm to the west of the curve, skidded across the 20-foot pavement to the east side of the road, left the road, struck and tore down 10 rods of wire fence on steel posts, struck a telephone pole, breaking out a center section thereof, and came to rest 35 feet beyond the pole. The distance involved, from where the automobile first left the highway on the west side of the road to where it came to rest, was 330 feet.
The highway was of asphalt, with a center line painted on it, and dry at the time of the accident, which occurred about 7:45 p. m.
Plaintiff testified that he was driving about 45 miles per hour when he “felt a terrific wobble on the front left wheel,” and that he fought the steering wheel while the car traveled from 150 to 200 feet, whereupon *89 it left the road and both he and his wife were injured.
While plaintiff was in the hospital, the wrecked car was taken to Marion, Ohio, and sold to the owner of a salvage and junk yard at Crestline, Ohio.
About three months after the accident, plaintiff and a neighbor, who was employed as a foreman in an automobile parts manufacturing plant, went to the junk yard in Crestline to examine the car. At that time the car had been partially dismantled and all the wheels were off. On this trip, plaintiff removed the spindle assembly and two pieces of the broken kingpin from the left front axle assembly. About a week later they returned to the junk yard to get more parts, at which time the support arm for the left front spindle assembly was removed. All these parts were introduced as exhibits.
In the front axle assembly, with which we are here concerned, the wheel, brake drum and wheel bearing were designed to revolve around an axle or spindle, which, in operation, was held in a horizontal position by means of a kingpin inserted in approximately a vertical plane through the spindle bracket, which was affixed to the inner end of the spindle, and through holes in the upper and lower brackets of the support arm, the whole wheel assembly turning in a horizontal plane on the kingpin. The support arm was affixed to the automobile and retained in a vertical position by means of pins at the top and bottom thereof. Between the upper bracket of the support arm and the top of the spindle bracket was a bearing to permit free turning of the spindle bracket on the kingpin. That bearing was not produced at the trial.
When plaintiff and his companion examined the automobile at the junk yard at the time of their first trip, the left front spindle assembly was loose and hanging away from the top bracket of the support arm, being attached to the automobile only by contact of *90 the lower end of the spindle bracket with the lower bracket of the support arm. The lower opening of the upper support arm bracket, as well as both openings in the spindle bracket, was distorted out of round, and the spindle itself was bent downward.
The kingpin was fractured in two places, or into three segments. Both breaks occurred inside the spindle bracket, the upper break occurring one-eighth inch below the top of the spindle bracket and the lower break occurring approximately the same distance from the bottom of the spindle bracket. Only two sections of the fractured kingpin were introduced in evidence, the top section not being produced. Plaintiff’s evidence was that, at the time he examined the car in the junk yard and removed parts therefrom, the middle section of the fractured kingpin was still in the spindle bracket, being held in place by a steel lock pin through the spindle bracket, that it was rusted at the end facing upward inside the spindle bracket, but that it was not rusted at the lower fracture. The bottom section was found encased in the lower bracket of the support arm, with the upper end in contact with the middle section at the point of the lower fracture inside the spindle bracket.
Substantially it is upon these facts, and the testimony of expert witnesses drawing inferences from them, that the jury returned the special verdict on which judgment was entered.
The special verdict is as follows:
“The jury in this eause on the concurrence of the undersigned jurors being not less than three-fourths of the whole number thereof, do return this special verdict herein by finding and presenting the facts as established by the evidence as follows:
“On July 8, 1948, plaintiff purchased a new Ford automobile from the defendant. On April 7, 1949, while plaintiff was driving said automobile in a *91 southerly direction on U. S. route No. 23, the steering mechanism thereof suddenly ceased to function and plaintiff lost control thereof. The failure of said steering mechanism was due to the fact that the left steel kingpin, which was a vital part of said steering assembly, had been broken. After said kingpin became broken, plaintiff, who had no knowledge of its broken condition, advised defendant that the steering assembly of said car seemed to be faulty, and that the car seemed to drift to the right or left. Plaintiff thereupon left his car with defendant for repair, and defendant informed plaintiff that the trouble with the steering mechanism had been remedied and that the steering assembly was faultless. Defendant could and should, in the exercise of ordinary care, have ascertained that said kingpin was broken, and should have replaced the same. Defendant failed, in March, 1949, and at other times to discover and replace said broken kingpin. Defendant failed to properly inspect said steering assembly at the times it made said repairs. Defendant represented to plaintiff after said inspection and as late as March, 1949, that said steering assembly was free from faults. Defendant failed to exercise reasonable care in said particulars. Each of the foregoing acts and omissions of the defendant constituted negligence. The failure of said steering mechanism to function on April 7, 1949, was directly caused by said acts and omissions of defendant. On account of the failure of the steering mechanism of plaintiff’s car, it left the highway and turned over, and plaintiff was thereby severely injured. Plaintiff was not himself negligent. Plaintiff did not know that his car was dangerous to operate, and believed from defendant’s representations that the steering mechanism was in a safe condition on April 7, 1949. Plaintiff’s wife was also severely injured as a proximate result of said occurrence and plaintiff *92 has incurred expense in the treatment of her injuries and has been deprived of her services and consortium as a direct consequence thereof. If, upon these facts, the court is of the opinion that plaintiff is entitled to recover, we find that he has been damaged, as a direct result of the injuries which he himself sustained on April 7, 1949, in the sum of $17,000, and as a direct result of the said injuries suffered by his wife in the sum of $3,000.”
The special verdict returned by the jury was in the form submitted by plaintiff.
Verdicts are of two kinds.
Section 11420-12, General Code, reads:
“The verdict of a jury must be either general or special. ’ ’
Section 11420-13, General Code, reads:
“A general verdict is one by which the jury finds, generally, upon any or all of the issues submitted, in favor either of the plaintiff or defendant.”
Section 11420-14, General Code, reads:
“A special verdict is one by which the jury finds facts only as established by the evidence; and it must so present such facts, but not the evidence to prove them, that nothing remains for the court but to draw from the facts found, conclusions of law.”
Section 11420-16, General Code, reads:
“When requested by either party, the court shall direct the jury to give a special verdict in writing, upon any or all issues which the case presents.”
In the present case, plaintiff requested the court to direct the jury to give a special verdict in writing, and thereupon it became incumbent upon the court to do so, and the jury could not thereafter return a general verdict.
We agree with the following statement of the Court of Appeals:
“Although the provisions of the statute are manda *93 tory, it is a meticulously difficult task to prepare a special verdict by which the jury finds ultimate facts only as established by the evidence and presenting such facts, but not the evidence to prove them, so that nothing remains for the court but to draw from the facts found the conclusions of law incorporated in the judgment to be entered upon such special verdict. It is not only a difficult and delicate task, but a party exercising the right frequently does so at his peril. As in the case of special interrogatories, it is exceedingly dangerous to the administration of justice to submit a special verdict except in strict accordance with the statute. Cf. McFadden v. Thomas, Admx., 154 Ohio St., 405, 412, 96 N. E. (2d), 254.”
The requirements of a valid special verdict were specified by this court in the case of Dowd-Feder Co. v. Schreyer, 124 Ohio St., 504, 179 N. E., 411, wherein this court held that a special verdict may be in a narrative form or in the form of answers to questions submitted but must contain the ultimate facts from which conclusions of law may be drawn and judgment rendered. To warrant a judgment the findings constituting the special verdict must be so clear, consistent and complete that the proper judgment can be rendered from the pleadings and the facts found, without reference to the evidence disclosed by the record. Where a special verdict is to be rendered,- only such instructions should be given by the court as are necessary to enable the jury clearly to understand its duties relative to such special verdict.
In the Dowd-Feder case, where a special verdict had been demanded, both plaintiff and defendant submitted forms to be considered by the jury, plaintiff’s form containing questions for the jury to answer, and defendant’s form being a narrative recitation. From the holding in that case it is apparent that it is not proper for the jury to make conclusions of law in a special *94 verdict or find evidentiary matters as distinguished from ultimate facts and the verdict must be complete and consistent in and with itself, without aider by intendment or reference to the evidence. If the verdict does not contain a finding of all the facts essential to sustain (or defeat) the cause of action, it will not support a judgment.
In the opinion of the Court of Appeals in the instant case it is stated:
“Plaintiff’s form of special verdict submitted and returned by the jury contains the following improper mixed findings of law and fact:
“ ‘Defendant could and should, in the exercise of ordinary care, have ascertained that said kingpin was broken, and should have replaced the same.
“ ‘Defendant failed to exercise reasonable care in said particulars.
“ ‘Each of the foregoing acts and omissions of the defendant constituted negligence.
‘ ‘ ‘ Plaintiff was not himself negligent. ’
í i # * *
“* * * But in the instant case the inclusion of the above mixed conclusions of law and fact was improper and cannot be regarded as nonprejudicial to defendant. ’ ’
We agree with this statement of the Court of Appeals, although in the opinion in the Dowd-Feder case, supra, it is stated:
“However, the inclusion of evidence supporting facts found in a special verdict will not render it defective if ultimate facts are found which warrant a judgment. Nor are conclusions of law proper in a special verdict, and they must be disregarded just as are evidentiary matters.”
In the present case, however, there was such a usurpation of the province of the court by the jury in its special verdict that it practically constituted an *95 argument to the court for a rendition of a judgment for plaintiff. Then, too, if the statement, “plaintiff was not himself negligent,” were disregarded, there would be no statement of ultimate facts in the special verdict from which the court could find whether plaintiff was guilty of contributory negligence.
It is true plaintiff testified he was driving 45 miles an hour, but, as against that, when the car went off the road, it skidded 40 feet across the highway and tore down 165 feet of wire fence on steel posts, struck a telephone pole, breaking out a center section thereof, and came to rest 35 feet beyond the pole, the total distance traveled being 330 feet as hereinbefore described.
The jury in its special verdict stated no ultimate facts with reference to any of this evidence and, therefore, from the special verdict the court could draw no conclusion of law in reference to the question of contributory negligence.
The special verdict returned by the jury in this cause illustrates the great danger, in the preparation of a special verdict, of a failure to submit a form thereof in strict conformance with the statute.
With reference to the errors of the trial court, as found by the Court of Appeals, in submitting to the jury, before argument, two special instructions offered by plaintiff and in failing to include in its special charge to the jury charges requested by defendant on the subject of the liability of defendant, the Court of Appeals held that the special charges, which concerned the question of damages, were erroneous because they began, “when you compute damages which may have resulted to plaintiff, ’ ’ without employing the usual and requisite preliminary hypothesis, “If in your consideration of the evidence in this case you find in favor of the plaintiff you may then proceed to consider and determine the amount of damages,” such charges in *96 ferring liability and being prejudicial to defendant.
. We do not literally agree with the Court of Appeals in this finding for the reason that in a special verdict the jury should find for neither plaintiff nor defendant, and it must make a finding on the question of damages. However, in the special verdict in the present case the jury substantially did find for plaintiff, and it may be that the inference of liability in the charge on damages without any preliminary statement induced the jury to make the finding that it did. Therefore, if special charges with reference to damages are given before argument in a case where a special verdict has been demanded, there should be a preliminary statement to the effect, “If upon the facts as you find them in your verdict the court should enter judgment in favor of plaintiff, in computing damages.”
With reference to the failure of the trial court to include in its general charge charges requested by defendant on the subject of the liability of defendant, ordinarily that would not be error for the reason that it is improper for the trial court to charge on the question of negligence at all where a special verdict is to be returned. As was said in the Dowd-Feder case, “only such instructions should be given by the court as are necessary to enable the jury to understand their duties relative to such special verdict. ’ ’ Such instructions should be limited to those which are necessary to inform the jury as to the issues made by the pleadings, as to the rules for weighing and considering the evidence, as to the burden of proof, and as to the rules in determining the credibility of witnesses, and to any further instructions necessary to enable the jury to clearly understand its function and duty concerning the rendition of the special verdict. It is not proper to give general instructions as to the law of the case.
In the present case, however, the trial court did undertake to charge on the questions of negligence and *97 proximate cause, and under such circumstances it was the court’s duty, upon request, to give a full charge on the subject, which would include the liability of defendant.
Since defendant’s requests were sufficient to call the court’s attention to such omission, and since the jury in its special verdict made findings of negligence, it was prejudicial error for the court to refuse to make a full and correct charge on the question of negligence, if it can be held that it was not prejudicial error to give any charge whatsoever on negligence.
We now come to a consideration of defendant’s claim that the Court of Appeals was in error in failing to render judgment in defendant’s favor.
Plaintiff’s sole claim of negligence against defendant is that the break of the left steel kingpin caused the failure of the steering mechanism and the collapse of the left front wheel of the automobile, which resulted in the accident and injuries, and that defendant was negligent in that, after being advised that the automobile did not steer properly, it failed to inspect the steering assembly and to discover, remove and replace the broken kingpin at the times it repaired the automobile.
It follows that plaintiff’s elaim against defendant collapses unless there is probative evidence that the kingpin was broken prior to the accident in which plaintiff and his wife were injured.
Plaintiff relies entirely upon circumstantial evidence, for there is no direct evidence in the record that the kingpin was broken at any time before the accident.
To attempt to prove that the kingpin was broken before the accident, plaintiff produced two expert witnesses who stated it to be their belief that the upper fracture of the kingpin occurred a considerable time before the second and lower break; that the upper break would cause the condition of the steering of *98 which plaintiff had complained to defendant; and that the upper portion of the kingpin was separated from the lower portion but was firmly held in place, until the time of or shortly before the accident, by a bearing which fitted into the steering assembly and by a “welsh” plug at the top of the support arm.
The experts based their opinion solely upon their examinations of the parts in evidence, upon the rusted condition of the kingpin at the upper fracture, as distinguished from the rustless condition at the lower fracture, upon the circumferential wear which appeared in the housing, upon the binding of the steering wheel causing the car to drift from right to left, and upon the wobbling and locking observed at the time of the accident.
The cross-examination of the expert witnesses by plaintiff discloses that there were no rotary marks evident, claimed to have been made by the rotation of the separated top portion of the kingpin, and that the kingpin could only have been broken by a very substantial impact.
When interrogated about the bent spindle — to determine if this bending could have occurred with the kingpin already broken — expert witness Palmer testified as follows:
Q. * * * Are you. a familiar with the type of material used in that sort of a spindle? A. Yes.
“Q. That is very tough and strong, isn’t it? A. It sure is.
“Q. And it takes a severe blow to bend it in that manner, doesn’t it? A. Yes.
“Q. And before any blow can bend this, there has to be some resistance on the kingpin, isn’t that correct? A. Yes.
< i # # *
“Q. If the kingpin were broken at the top, as you say — A. Yes.
*99 “Q. There would not be sufficient resistance in the kingpin for any blow of any force to bend that spindle, would there? A. At- the moment — yes.
“Q. Yes, what? A. You said if the kingpin was broken here there wouldn’t be enough resistance to bend this axle.
•“Q. That’s right? A. Yes, there would not be enough resistance to bend that axle.”
The only physical evidence that the break occurred before the accident was the presence of rust on the upper end of the middle section of the fractured kingpin, which fact is claimed as proof that the broken pin was in the steering assembly at all the times the automobile was in the possession of defendant for repairs.
Testimony of a witness for plaintiff established that when the steering assembly was dismantled the entire left front spindle assembly was hanging loosely, held to the lower segment of the support arm by the remaining portion of the kingpin; that the upper break was below the top surface of the spindle bracket where there was opportunity for water to accumulate upon it, which would naturally have resulted in the creation of rust; and that months had passed between the time of the accident and the removal of the kingpin, during which time all the parts of the junked automobile were exposed to the weather.
It is to be noted that the top of the kingpin was missing whereas the aperture in the lower segment of the kingpin was closed, where the broken surfaces were held togéther.
Under the law of Ohio it was plaintiff’s obligation, in order to recover against defendant, to produce evidence which furnished a reasonable basis for sustaining his claim. If evidence so produced furnishes a basis for only a choice among different possibilities as to any issue in the case, the burden as to such issue is not sustained. L. S. & M. S. Ry. Co. v. Andrews, *100 Admr., 58 Ohio St., 426, 51 N. E., 26; Village of Willoughby v. Malone, 122 Ohio St., 315, 171 N. E., 402; Gedra v. Dallmer Co., 153 Ohio St., 258, 91 N. E. (2d), 256, 17 A. L. R. (2d), 453; Boles v. Montgomery Ward & Co., 153 Ohio St., 381, 92 N. E. (2d), 9; and Gerich v. Republic Steel Corp., 153 Ohio St., 463, 92 N. E. (2d), 393.
The evidence in the record in the present case, giving plaintiff the benefit of every possible presumption in his favor, assuredly shows a situation in which it is just as likely that the kingpin was broken as a result of the accident as it is that it was broken prior thereto. The main argument for the existence of a prior break was the rust on the one end of the fractured kingpin, which it seems could quite likely have accumulated during the three months of its exposure to the weather in a junk yard. As against the claim that the rust showed a prior break of the kingpin was the evidence that the spindle or axle could not have been bent by the collision if the kingpin had been broken, that there were no rotary scratches on the inside of the spindle bracket, and that a strong impact or force was necessary in order to break the kingpin. Of course, if the kingpin had not been broken before the accident there would be no claim of negligence against defendant, and it seems that the hypothesis of defendant’s liability has been explained away, and that the evidence pointing to the fact that the kingpin was not broken prior to the accident goes unrebutted.
Plaintiff by his evidence has not only gone no further than to furnish a basis for only a choice among possibilities as to liability or nonliability of defendant, but it seems to us has produced evidence greatly favoring nonliability. At best, a verdict for plaintiff could only be based on conjecture, guess, random judgment, or supposition and could not thereby be upheld. Boles v. Montgomery Ward & Co., supra.
*101 We are of the opinion that as to another issue of the case plaintiff has failed to produce any probative evidence to sustain a verdict against defendant.
The liability sought to be imposed upon defendant by plaintiff is predicated on a failure to inspect, discover and adequately repair a claimed latent defect in plaintiff’s automobile.
There is no such liability for damages upon the part of an automobile repairman unless he contracted to repair or service an automobile and failed to use ordinary skill and judgment in making such repairs or in performing such services. The rule is stated in 24 American Jurisprudence, 491, Section 24, as follows:
“As a general rule, one who contracts to repair or service an automobile is liable for any damage proximately resulting from the negligent or unskillful manner in which he makes the repairs or performs the services.”
In 7A Blashfield Cyclopedia of Automobile Law and Practice, 555, Section 5029, it is stated :
“A contract of bailment of an automobile for repairs with a garage keeper imposes upon him the duty to use ordinary care, not merely to select competent employees, but to do the work required with ordinary skill and judgment. If he employs such ordinary care and skill, he will not be liable for negligence in making the repairs, although he has not followed the best fashion or method. The burden of showing want of ordinary skill is upon the automobile owner, and where the testimony does not reasonably exclude other causes of accidents than improper workmanship, the jury can not be permitted to guess that the accident was caused by negligence. ’ ’
No liability can be imposed upon defendant for its alleged failure to discover a latent defect, unless the evidence shows that it undertook to do so and negligently failed to discover the defect.
*102 It is true defendant sold the automobile to plaintiff but that would not make it liable for a latent defect of which it had no knowledge. Any such liability would be upon the manufacturer, who was originally a party in this action but was dismissed therefrom. Thrash v. U-Drive-It Co., 158 Ohio St., 465, 110 N. E. (2d), 419.
The evidence in the present case, construed most strongly in favor of plaintiff, shows only that plaintiff advised defendant from time to time that the automobile drifted to the right or left. The automobile was left several times for repairs, but at no time was any order given to disassemble or take apart the steering apparatus except as might be implied from the work orders of July 23, 1948, and September 1, 1948. The September 1, 1948, order contains a notation, “Car pulls to right. Correct. ’ ’ On the same day there was a “steering alignment inspection report” which details the “toe-in,” “camber,” “caster,” and turning radius of the front end of the automobile, and shows the kingpins on right and left as “O. K.”
Thereafter, from time to time, the automobile was left with defendant for repairs to the right door and rear deck handle, overhauling of the rear axle, timing and adjusting of the motor, repair to the rear door, motor tuneup and brake adjustment, replacement of the left door molding, and installation of shims on right door, but there is no evidence of any order from plaintiff to defendant or any undertaking by defendant to disassemble the steering apparatus, from September 1, 1948, from which time the automobile was driven 2,800 additional miles, to the day of the accident.
It is obvious from an inspection of the exhibits that the claimed broken kingpin, if it existed before the accident, could not have been discovered except by dismantling the left front axle assembly.
Plaintiff unquestionably did complain on various occasions that the car was not steering satisfactorily.
*103 Defendant claimed continuously that the steering apparatus was “O. K.,” and shortly before the accident a service manager of defendant drove tne automobile with plaintiff and told him that the steering apparatus was all right and that any defect in the steering was a product of plaintiff’s own imagination. There is no question made that this service man gave his own best judgment upon the subject, and if plaintiff was dissatisfied with it he had the privilege of ordering defendant to make a complete inspection of the steering apparatus, including dismantling of both front axle assemblies, so as to discover any possible latent defect.
Since there is no evidence that defendant was ever ordered to make any such repairs, and since it never purported to give opinions to plaintiff based on more than casual inspections, we cannot see that defendant breached any duty it owed in reference to repairs, in the absence of a contractual undertaking to make them.
There is no evidence of plaintiff, either factual or opinion, as to when the kingpin was broken. There are only opinions that the break occurred before the accident, but since no one fixed the time, how can it be claimed that there was a break at any time the automobile was in defendant’s possession?
In the absence of any probative evidence that the kingpin of plaintiff’s automobile was broken prior to the accident in which he received his injuries, or that plaintiff ever ordered, or defendant ever undertook, the dismantling of the front axle assemblies of the automobile for the discovery of a possible latent defect, we conclude that the trial court was in error in overruling defendant’s motion for a directed verdict and for judgment notwithstanding the verdict, and that the Court of Appeals was in error in not entering final judgment for defendant.
The judgment of the Court of Appeals, so far as it *104 reverses tlie judgment of the Court of Common Pleas, is affirmed but, so far as it fails to render final judgment for defendant, is reversed, and final judgment is rendered for defendant.

Judgment accordingly.

Weygandt, C. J., Middleton, Hart and Zimmerman, JJ., concur.
Taft, J., concurs in paragraph six of the syllabus and in the judgment.
Lamneck, J., not participating.